**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Floyd Edward RICHARDSON, Defendant-Appellant.**

**No. 17594.**

United States Court of Appeals Sixth Circuit.

Jan. 31, 1968.

Daniel T. Taylor, III, Louisville, Ky., for appellant.

Moss Noble, Asst. U. S. Atty., Lexington, Ky., George I. Cline, U. S. Atty., Lexington, Ky., on brief, for appellee.

Before WEICK, Chief Judge, COMBS, Circuit Judge, and CECIL, Senior Circuit Judge.

COMBS, Circuit Judge.

This is a direct appeal from a judgment sentencing appellant to eight years imprisonment for wrongfully having in his possession money stolen from a federally insured bank. 18 U.S.C. § 2113 (c).

The Bank of Simpsonville, Kentucky, was burglarized in the early morning hours of May 12, 1965. At about 5:30 A.M., a witness saw two men carrying bags emerge from the rear entrance of the bank and watched as they hid the bags behind the bank. The witness told police officers later in the day that he had recognized appellant as one of the two men who had come out of the bank. The local police officers and agents of the Federal Bureau of Investigation found the two bags, containing silver coins, which the burglars had hidden. The coins were removed, the bags were filled with gravel, and were dusted with fluorescein powder which has the capability of fluorescing when excited with an ultraviolet light. The bags were then replaced in the same hiding places and were electrically wired so that an

alarm would be sounded when the bags were disturbed.

On the evening of the same day the officers, having stationed themselves at vantage points in the area of the bank, saw a man answering appellant's description walking in the direction of the bags. The alarm signal attached to the bags sounded and a man was seen running from the scene. One of the officers gave chase but the man escaped. A Cadillac automobile was found parked near the bank and a check of vehicle registration records disclosed that it was owned by appellant. The officers contacted the Louisville Police Department and alerted it for a possible stolen car report by the owner of the Cadillac. Shortly after 11:00 P.M., the police advised the FBI agents that appellant had reported his vehicle stolen. The FBI agents then went to Jack and Pat's Grill in Louisville, some fifteen miles from the scene of the burglary, where the appellant worked. When they arrived at the grill appellant was there and was in conversation with two officers of the Louisville Police Department who apparently had come in response to the stolen car report. We now quote from the testimony of Special Agent Domalewski of the FBI:

"Q. 57. Tell what you found or what was going on when you went into Jack and Pat's Grill, if anything?

A. Well, when we entered Jack and Pat's Grill, Mr. Richardson was in the grill sitting behind the counter toward the front, toward the entrance. There were two city detectives already in there—Detectives Lockwood and Whitus. There was another man sitting down at a table in the rear of the restaurant toward the back.

Q. 58. What was going on, if anything?

A. When we entered, Detectives Lockwood and Whitus were talking to Mr. Richardson. And I stepped up and introduced myself, told him who I was, showed him my credentials and advised him he did not have to talk to us if he did not care to, that he had the right

to remain silent, and that anything he told us could be used in a court of law and he had the right to consult with an attorney if he so chose.

Q. 59. Did you thus advise Mr. Richardson before or after he had terminated his conversation with the detectives.

A. No. He had completed his conversation with the detectives."

Appellant talked freely with the agents although some of his answers were evasive and contradictory. Again we refer to the testimony of Special Agent Domalewski:

"Q. 63. Did you make any other request or inquiry of the defendant.

A. Yes.

Q. 64. What was done?

A. I told him we would like to look at his hands. And he started to show me his hands and I said 'No, we would like to look at them under a light.' And there was no socket where he was sitting behind the counter. There was a socket on the opposite wall. I asked him if he would come around to where the socket was so that we could look at his hands. He came around from behind the counter into the table area of the cafe, sat down at, I think it was the second table from the front where the light was. Mr. Brown had the light. Mr. Brown plugged it in. Richardson put his hands up on the table, palms down, and we shined the light on the backs of his hands; and then I asked him to turn his hands over, which he did, and shined the light on the palms of his hands.

Q. 65. Describe what you saw when such examination was made.

[Objection—objection overruled.]

Q. 66. The Court says you may answer.

A. On the backs of his hands I saw a greenish yellow fluorescence in the creases around his fingernails. There was some slight fluorescence from the creases in his knuckles.

When he turned his hands over, there was the same color fluorescence in the palms of his hands. It was principally located in the creases and in the grooves in the hands, wherever the hands would fold. That's where the largest collection was."

■ It is contended that the activities of the officers at the grill violated appellant's constitutional rights secured to him by the Fourth, Fifth, and Sixth Amendments. We do not agree. We do not regard the examination of appellant's hands under the ultraviolet light as a search within the meaning of the Fourth Amendment. See Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), where a sample of the defendant's blood was taken for testing without his consent.

■ Even if it should be conceded that the examination of appellant's hands was in legal effect a search, then we agree with the finding of the District Judge that the appellant voluntarily consented to it. Simmons v. Bomar, 349 F.2d 365 (6th Cir. 1965). Also see United States v. Page, 302 F.2d 81, 82–83 (9th Cir. 1962), where it was said on the subject of consent to a search without a warrant:

"The question presented is, does the evidence, viewed most favorably to the government, require a decision, as a matter of law, that the search was illegal and therefore a violation of Page's rights under the Fourth Amendment to the United States Constitution? We are of the opinion that it does not. The question is one of fact, for the trial court to resolve."

The facts in this case are easily distinguishable from those in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), relied on by appellant, where the officers had made a forced entry into defendant's living quarters and the arrest was made on the basis of their observations inside the room. Here the officers had a legal right to go into the grill where appellant worked. It was a public place. In addition, the appellant had in effect invited the officers to come to see him by filing the stolen car report. The other cases cited by appellant are also distinguishable.

■■ The point is made in brief that the examination of appellant's hands was made prior to his arrest. That is of no comfort to him. Voluntary consent, which we have found in this case, will be inferred more readily where it is given before arrest than afterward. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). Cf. Wion v. United States, 325 F.2d 420, 423 (10th Cir. 1963). This, of course, is on the theory that after arrest a subject is more susceptible to duress and coercion from the custodial officers.

■ The appellant complains that he was tricked into permitting the examination of his hands. Certainly, from his standpoint, he used poor judgment in giving such permission but it is the sort of poor judgment from which the law does not protect. He gambled on his ability to convince the officers of his innocence. He set the stage and selected the role which he would play; he cannot now complain that he overplayed his part. The officers were under no duty to advise him of the propensities of fluorescein nor that it fluoresces under ultraviolet light. They were under no duty to inform him that the money bags had been dusted with fluorescein powder or what they expected to find from the examination of his hands. In summary, we find no ground for criticism of the officers' actions. They should be commended for using in a legally permissible manner the knowledge of modern science in the solution of this crime.

The judgment is affirmed.