**UNITED STATES of America, Plaintiff,**

v.

**Matt M. MILLEN, Defendant.**

**No. 70–CR–76.**

United States District Court, E. D. Wisconsin.

March 7, 1972.

David J. Cannon, U. S. Atty., by Steven C. Underwood, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

Robert J. Lerner, Milwaukee, Wis., for defendant.

## OPINION AND ORDER

REYNOLDS, Chief Judge.

The defendant, Matt M. Millen, has been charged in a one-count information with receipt, facilitation of the transportation, and concealment of approximately 348 grams of marihuana (hashish), in violation of 21 U.S.C. § 176a. The defendant has moved to suppress: (1) his arrest without a warrant; (2) all items of tangible evidence taken from his lock box in the law firm for whom he worked

on March 26, 1970, without a search warrant; (3) all statements made by him at the United States Marshal's office after his arrest on March 26, 1970; and (4) the results of any examination of his hands under an ultraviolet light subsequent to his arrest on March 26, 1970.

An evidentiary hearing was held. Based on the evidence taken, matters of record, and representations of counsel, I find the facts to be as follows.

On February 27, 1970, officers of the United States Customs office in Chicago, Illinois, examined three mail parcels addressed to Matt Millen, 2100 Marine Plaza, Milwaukee, Wisconsin, from Bishwa Nath, Kathmand, Nepal. The parcels were not accompanied by the required customs declaration identifying their contents. On March 2, 1970, the Customs Laboratory in Chicago opened the parcels and found that they contained hashish. Before closing the parcels, the agents dusted the marihuana (hashish) with a fluorescent powder which glows upon contact with an ultraviolet light.

Special Agent Harry M. Sedan of the Customs Service along with two other investigators, Richard Tewes and Adam Strzok, were assigned to investigate the addressee of the parcels. The investigation disclosed that the addressee, Matt Millen, occupied an office in the law firm located at 2100 Marine Plaza, Milwaukee, Wisconsin.

With the consent of Mr. Robert P. Harland, president of the firm, Agent Sedan was staked out in an office adjoining defendant's on March 26, 1970. At about 1:35 P.M., one of the three parcels addressed to the defendant was delivered by mail to the firm. At about 1:50 P.M. the same day, the defendant took custody of the parcel from the firm's receptionist and proceeded to his private office. Later that afternoon, unbeknownst to Sedan, the defendant placed the parcel in his personal lock box in the firm's walk-in safe.

At approximately 3:30 P.M., the Milwaukee Police Department and the Bureau of Narcotics were called by the federal agents to ascertain whether anyone had reported receipt of narcotics or any suspicious substance through the mail as is required by law. No such reports had been made.

At approximately 5:40 P.M., Sedan observed Millen leave the office with his topcoat and briefcase as if he were leaving for the day. A search was then made of Millen's private office by Mr. Harland, but the parcel was not found. Sedan then ordered that Millen be arrested. At about 5:45 P.M., the defendant was stopped in front of 312 East Wisconsin Avenue by a detective from the Milwaukee Police Department on the pretense of a jaywalking violation. The detective was, in fact, assisting in the investigation. At 5:53 P.M., Agent Tewes arrested the defendant without a warrant. The defendant was verbally advised of his *Miranda* rights on the street by Tewes.

Millen, having been arrested, was then brought to the United States Marshal's office in the Federal Building. The marshal had not yet arrived, so the defendant, surrounded by law enforcement personnel, had to wait in the corridor. The emotional and psychological shock to the defendant during this period of time was, needless to say, severe. Only minutes before Millen was a highly paid, rising young tax attorney associated with one of the better law firms in Milwaukee. Now waiting in the corridor for the marshal's arrival he saw his world caving in on top of him. Mr. Millen requested that he be permitted to make a phone call. His request was denied at that time, but he was told that he could make a phone call as soon as the marshal arrived. I take judicial notice that there is a pay phone in the hallway outside of the marshal's office.

When the marshal arrived the defendant was taken into the office to begin processing. At about this time Agent Strzok arrived at the marshal's office. He approached Millen and asked him if anyone had informed him of his right to remain silent and his right to an attor-

ney. Millen indicated that he had been so informed by Agent Tewes. Then, without inquiring of Millen whether he wished to waive those rights, or letting him make a phone call, Strzok began interrogating Millen in an attempt to discover where the hashish was. He learned from Millen that it was in the law firm's vault in Millen's personal lock box. As Millen possessed the only keys to the box, Strzok continued the questioning until he ascertained that Millen had the keys in his briefcase. Strzok took the keys.

Strzok then drove back to the law firm and gave the keys to Agent Sedan who, in turn, gave the keys to Mr. Harland. Harland opened Millen's personal lock box, inventoried the contents, and turned the contents over to Agent Sedan. Included in the contents was the parcel of hashish along with personal items such as family securities. This search was made without a search warrant and without Millen's being advised of his Fourth Amendment rights. The law firm had given Millen complete control over his lock box free from any right of inspection by the firm. Millen had the only keys; the firm retained none. The Government contends that Millen, by his actions, impliedly consented to the search. Millen denies this.

Back at the marshal's office at about the same time that Millen's lock box was being searched without a warrant, the agents who had remained with Millen placed Millen's hands under an ultraviolet light. The hands emitted a glow, indicating a positive result.

Millen was then given an opportunity to place his requested phone call.

On the basis of these facts, the defendant raises four issues in his motion to suppress:

1. Was the warrantless arrest of the defendant valid?

2. Was there a waiver by defendant of his *Miranda* rights?

3. Was the warrantless search of the lock box valid?

4. Was the fluorescent light test valid?

I find that the arrest and fluorescent light test were valid, but that the interrogation and search were improper.

## THE ARREST

The defendant challenges the validity of the arrest because no warrant was obtained even though allegedly it would have been practicable to do so. Therefore, under the theory of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), defendant continues any statements he made and any evidence seized subsequent to his arrest are fruits of an unlawful arrest and must be suppressed. I find this argument to be without merit.

It has long been held that as long as probable cause for an arrest exists, arrest warrants are unnecessary, even when there is time to obtain them. See Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). As stated in the dissenting opinion by Mr. Justice White in Chimel v. California, 395 U.S. 752, 778–779, 89 S.Ct. 2034, 2048, 23 L. Ed.2d 685 (1969):

"The judgment of Congress is that federal law enforcement officers may reasonably make warrantless arrests upon probable cause, and no judicial experience suggests that this judgment is infirm. * * * And this Court has regularly affirmed the validity of warrantless arrests without any indication whatever that there was no time to get a warrant, and indeed where all the circumstances pointed to the opposite conclusion. *E. g.*, Ker v. California, 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726] (1963); Draper v. United States, 358 U.S. 307, [79 S.Ct. 329, 3 L.Ed.2d 327] (1959). * * * "

In trying to impose search protections on the law of arrest, defendant alludes to a decision by another branch of this court in United States v. *Case*, No. 69— CR–95 (E.D.Wis.1969), affirmed 435 F. 2d 766 (7th Cir. 1970). In *Case*, Secret

Service agents made a forced entry into a building leased by the defendant Case and used as a printing establishment. The occupants were arrested on a charge of manufacturing counterfeit currency. The forced entry and arrests were effected without warrants even though it would have been practicable to obtain them. The Court said:

"* * * I believe the case can and should turn primarily on the erroneous decision of the Secret Service Agents to enter these premises without first obtaining an appropriate warrant from a judicial officer * * *." (Emphasis supplied.)

Clearly, *Case* was aimed at the warrantless *entry* by law enforcement officers into the private occupied premises of Case. On that important ground the facts here are distinguishable, for the arrest occurred on a public street.

■ The defendant does not dispute that there was probable cause for arrest. Accordingly, defendant's motion to suppress the arrest must be denied. In addition under the facts and circumstances of this case, I do not believe that it would have been practicable to get an arrest warrant since Millen was leaving his office with a briefcase, and he might well have been carrying the contraband with him.

## THE INTERROGATION

■ In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that when a citizen is arrested, statements made during interrogation may not be used against him at trial unless (1) the defendant is expressly warned prior to examination that he has the right to remain silent and/or the right to an attorney, and (2) the defendant waives these rights. Further, it was held that even though the defendant may initially waive his rights, he is free at any time to reassert them. Upon failure to waive or upon reassertion of rights, all interrogation must come to a halt.

■ The burden of proving that the interrogation statements lie within the confines of *Miranda* rests on the Government, and this burden is not met simply by showing an initial warning but rather only by showing warning *and* waiver. I *assume* for purposes of this opinion that in the instant case defendant was properly warned of his *Miranda* rights. Accordingly, I turn to the question of waiver. The pertinent facts are as follows. The defendant, an attorney unfamiliar with criminal law and in a state of emotional and psychological shock, was warned of his rights. The defendant was not asked if he wished to waive his rights, and he made no such statement to that effect. Defendant sought to exercise his rights by making a phone call but was refused permission. The defendant responded to government questioning. The defendant was not permitted to make a phone call until the agents had completed their interrogation and had obtained all of the information at issue.

■ Waiver of *Miranda* rights must be determined on a case by case basis. United States v. Glasgow, 451 F. 2d 557 (9th Cir. 1971). Intelligence, *id.*; knowledge of criminal procedure, *id.*; refusal to sign a waiver of rights form, United States v. Ramos, 448 F.2d 398, 399 (5th Cir. 1971); United States v. Crisp, 435 F.2d 354 (7th Cir. 1970); failure of the Government to ask for a waiver, United States v. Daniel, 441 F. 2d 374 (5th Cir. 1971); signing of a waiver after interrogation, United States v. Montos, 421 F.2d 215 (5th Cir. 1970); responding to Government questioning, United States v. Ganter, 436 F. 2d 364 (7th Cir. 1970); failure to assert rights after being warned, *id.*; all may be indicative of waiver or nonwaiver but no one factor in and by itself is determinative.

■ I conclude that the Government has in this case failed to meet its burden. While this judgment rests on the totality of the facts before me, two facts in particular lead to this conclusion. First, the Government at no time sought

to elicit from Millen an actual waiver of his rights. In the Seventh Circuit at least the Government bears an especially heavy burden when it seeks admission of statements which are made after a request for a signed waiver by the Government is met by a defendant's refusal to sign. United States v. Jenkins, 440 F.2d 574 (7th Cir. 1971); United States v. Nielson, 392 F.2d 849 (7th Cir. 1968). To hold that the Government might avoid the chance imposition of this burden by simply declining to seek an express waiver of rights would be nothing more than an undercutting, if not a reversal, of these two Seventh Circuit decisions. Thus, these two cases suggest, at least in so far as determining the proper burden of proof, that when the Government fails to request a waiver, than the situation may be considered akin to a refusal by defendant to sign a requested waiver. For not "even the slightest circumvention or avoidance [of the *Miranda* rule] may be tolerated." United States v. Crisp, 435 F.2d 354, 357 (7th Cir. 1970).

Second, defendant sought to make a phone call but was refused the opportunity until after interrogation. Clearly, not only did this negate any inference of waiver, but this request was in fact an assertion of rights. Thus, even assuming that I were to find an initial waiver of rights, all statements in response to questions asked after the defendant's request to phone would be invalid, for *Miranda* leaves no doubt that the interrogation must cease the moment the defendant asks for help.

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' " Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). In the case at hand the record is virtually barren of evidence showing such a waiver of rights and, in fact, demonstrates a thwarted attempt to secure aid. Rights "given by the Constitution are too fundamental and too precious for waiver lightly to be found." United States v. Blalock, 255 F.Supp. 268, 269 (E.D.Pa.1966). The Government has clearly failed to prove a waiver of rights on the part of Millen, and, accordingly, from the time of his arrest all statements made by Mr. Millen in response to the questioning of government agents on March 26, 1970, must be suppressed.

### THE SEARCH

It is clear from the testimony that the warrantless search of Matt Millen's lock box was a fruit of interrogation subsequent to arrest—interrogation which I have held was in violation of *Miranda*. Accordingly, the warrantless search of Mr. Millen's lock box must be suppressed.

Even if I assume that *Miranda* was complied with, the warrantless search must still be suppressed in that the Government has failed to demonstrate a waiver by Mr. Millen of his Fourth Amendment rights and a consent to the search. "Courts have not looked with favor on the practice of substituting consent for the authorization of a search warrant." United States v. Dichiarinte, 445 F.2d 126, 129 n. 1 (7th Cir. 1971). And "[when there is an] absence of a written waiver or warnings concerning fourth amendment rights" then it is particularly necessary for the government to clearly show that there was, in fact, voluntary consent. *Id.* at 128 n. 1; United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966).

In the instant case the Government admits that it neither warned Mr. Millen of his Fourth Amendment rights nor secured from him a written waiver of those rights. Further, the Government concedes that Mr. Millen did not give an express verbal consent to any search. Rather, the Government's position is simply that while being interrogated the defendant impliedly consented by giving Agent Strzok the keys to the lock box. The defendant denies both that he gave

Strzok the keys or that he consented to the search. I do not think that the Government has succeeded in demonstrating that Matt Millen voluntarily consented to a search of his lock box.

The Government also contends that Robert P. Harland, the president of the law firm, had sufficient standing to consent to a search of the lock box. The testimony clearly established that Mr. Harland was not in a position to consent to such a search. The defendant was the only person who had keys to this lock box. These boxes were available for personal use by members of the law firm. Indeed, Mr. Harland did not even know of the existence of these boxes until after Mr. Millen's arrest. The Government has not established that Harland had equal rights to use the lock box and/or that he could consent to a search of Mr. Millen's personal belongings in an area which was specifically set aside for Millen's own personal use. Cf. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

The Government had every opportunity to obtain a valid search warrant. However, for reasons which are not clear from the record, the Government failed to obtain one. In that the Government has failed to establish that Matt Millen voluntarily consented to the search or that Robert Harland had the authority to consent to a search of Mr. Millen's personal lock box, the search of that box must be suppressed.

THE FLUORESCENT TEST

After the defendant was taken to the United States Marshal's office, his hands were placed under a fluorescent light. His hands glowed a bluish color on the palms, the fingers, and within the fingernails. Defendant now asserts that the agents were required to obtain a search warrant prior to examining the defendant's hands under the fluorescent light. I find, however, that

an examination by law enforcement agents of a person's hands under a fluorescent light while he is in custody does not constitute a search subject to Fourth Amendment constraints. United States v. Richardson, 388 F.2d 842, 845 (6th Cir. 1963). Generally, see Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

The defendant's motion to suppress the results of the examination of the defendant's hands an ultraviolet light must be denied.