STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Michael Paul RODGERS, Defendant-Respondent.

Supreme Court

*No. 82–1930–CR. Argued March 29, 1984.—Decided June 12, 1984.*

(Also reported in 349 N.W.2d 453.)

For the plaintiff-appellant-petitioner the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

For the defendant-respondent there was a brief by *Jerold W. Breitenbach* and *Breitenbach & Zievers*, Kenosha, and oral argument by *Jerold W. Breitenbach*.

STEINMETZ, J. The issue in this case is whether the defendant's mother voluntarily consented to the entry into her home by sheriff's deputies who arrested her son. The deputies asked the defendant's mother whether the defendant was home and whether they could talk to him. After entering, they placed the defendant under arrest without questioning him. Although the deputies did not have a warrant to arrest the defendant, they did have probable cause for the arrest.

The defendant, Michael Paul Rodgers, was charged with one count of false imprisonment in violation of sec. 940.30, Stats.

At the preliminary hearing, the defendant was bound over for trial, and thereafter, an information was filed charging the defendant with false imprisonment.

The defendant filed a motion to dismiss on the ground the trial court lacked jurisdiction since the arrest was illegal. The parties stipulated that there was probable cause for the arrest and the state did not rely on exigent circumstances to justify the entry into the home. The parties also stipulated that the testimony taken at the preliminary hearing could be used by the trial court to decide the motion. The trial court, the Kenosha county circuit court, Honorable Michael S. Fisher, granted the motion to dismiss finding that the warrantless arrest of the defendant in his home was unconstitutional. The trial court concluded that: "[T]he entry into the defendant's home was not obtained by consent that could be considered a free, intelligent, unequivocal and specific waiver." The state appealed the trial court's order.

The court of appeals, in a published decision, affirmed the trial court's order holding that the consent to enter the home was invalid because it was obtained from the defendant's mother by deception since the deputies did not tell her that they intended to arrest the defendant. *State v. Rodgers*, 115 Wis. 2d 118, 339 N.W.2d 605 (Ct. App. 1983).

Detective Mielke testified that on June 10, 1982, he was assigned to a follow-up investigation in reference to assault and false imprisonment charges involving the defendant. Detective Mielke said that shortly after noon on June 11, 1982, he and Detective Vena went to the defendant's home where the defendant's mother met them at the door. Mielke said that they identified themselves, told her they wanted to talk to her son, and asked whether he was home. Neither deputy told the mother that he was there to arrest the defendant. The mother said he (the defendant) was seated in the living room on a couch and let them into the home; the detectives could see the defendant from the outside.[1] The detec-

---

[1] The record does not explain what the deputy meant by "seeing the defendant from the outside," *i.e.*, whether that was an

tives told the defendant they wanted to talk to him and when the defendant got up and started to say something, Mielke told him he was under arrest. Mielke estimated that he was in the house one or two minutes before arresting the defendant. Mielke told the defendant they were there in connection with an incident involving Carmen Karau on June 9, 1982, who complained of a fight with the defendant and that she had been hurt and forced to ride with him from Kenosha to a point approximately 45 miles from Green Bay and back to Kenosha. Mielke told the defendant he was under arrest for battery and false imprisonment. After the defendant was arrested he was taken to the squad car and advised of his rights. Enroute to the sheriff's department the defendant gave a verbal statement, and after they arrived at the sheriff's department, the defendant gave a written statement.

The defendant moved to dismiss the action on the ground that his warrantless arrest in his home was in violation of sec. 968.07, Stats.,[2] Art. I, secs. 8 and 11 of the Wisconsin Constitution,[3] and the fourth, fifth and

observation as they stood in the open door or whether it was a previous view through a window.

[2] Sec. 968.07 (1), Stats., provides:

"**968.07 Arrest by a law enforcement officer.** (1) A law enforcement officer may arrest a person when:

"(a) He has a warrant commanding that such person be arrested; or

"(b) He believes, on reasonable grounds, that a warrant for the person's arrest has been issued in this state; or

"(c) He believes, on reasonable grounds, that a felony warrant for the person's arrest has been issued in another state; or

"(d) There are reasonable grounds to believe that the person is committing or has committed a crime. . . ."

[3] Art. I, Sec. 8 of the Wisconsin Constitution provides as follows:

"**Prosecutions; double jeopardy; self-incrimination; bail; habeas corpus.** SECTION 8. (1) No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor

fourteenth amendments of the United States Constitution.[4]

may be compelled in any criminal case to be a witness against himself or herself. . . ."

Art. I, sec. 11 of the Wisconsin Constitution provides as follows:

"**Searches and seizures.** SECTION 11. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

[4] The fourth amendment of the United States Constitution provides as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fifth amendment of the United States Constitution provides as follows:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The fourteenth amendment, sec. 1, of the United States Constitution provides as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The law governing warrantless arrests in a person's home has been set forth in *Payton v. New York*, 445 U.S. 573, 576, 590 (1980), and *Laasch v. State*, 84 Wis. 2d 587, 596, 267 N.W.2d 278 (1978). The police can make a valid warrantless arrest in the person's home if the police possess probable cause and exigent circumstances exist to justify entry into the home or they have consent to enter the home. Neither *Payton* nor *Laasch* dealt directly with entry into a home with consent.[5] *Laasch* did recognize that consent to enter the home was an exception to the exigent circumstances requirement.

The parties stipulated that there was probable cause for the warrantless arrest and the state does not rely on exigent circumstances to justify the entry into the home. Therefore, the issue is whether the defendant's mother gave consent to the entry of the deputies into the home so that the warrantless arrest based on probable cause was constitutional.

*Laasch* held at 592:

"Consent to an entry is not to be lightly inferred, but must be shown by clear and convincing evidence. *Kelly v. State*, 75 Wis. 2d 303, 316, 249 N.W.2d 800 (1977). The burden is on the state to show a free, intelligent, unequivocal and specific waiver. *Gautreaux v. State*, 52 Wis. 2d 489, 190 N.W.2d 542 (1971)."

The present case concerns what legal significance is to be attached to the facts over which there is no dispute.

---

[5] The dissent also cites the recent decision of *Welsh v. Wisconsin*, —— U.S. —— (No. 82-5466, filed May 15, 1984), in that it affirmed the rulings in *Payton* and *United States v. United States District Court*, 407 U.S. 297 (1972). However, *Welsh* is not relevant to the instant case regarding voluntary consent since the U.S. Supreme Court assumed for the purposes of its decision that there was no valid consent to enter the petitioner's home in that case. *See, Welsh*, n. 1.

Since the case presents a question of law not fact, the trial court's decision is not entitled to any deference. *State v. Felton*, 110 Wis. 2d 485, 504, 329 N.W.2d 161 (1983) ; *Compton v. Shopko Stores, Inc.*, 93 Wis. 2d 613, 616, 287 N.W.2d 720 (1980).

In reaching its decision, the trial court cited three points; they were: (1) there was nothing in the record that provided any reason for not obtaining a warrant; (2) the consent could not be valid unless it could be considered "a free, intelligent, unequivocal and specific waiver;" (3) and, the deputies did not tell the defendant's mother the real purpose for their visit, that being to arrest her son.

There is no requirement that the police or deputy sheriffs obtain a warrant to make an arrest. In *Laasch,* we held at 591 :

"This court has rejected the argument that whenever there is time to do so, a warrant must be obtained before making a felony arrest. In *Rinehart v. State, supra,* at 766, 767, this court adopted the rationale of *United States v. Millen* (E.D. Wis. 1972), 338 Fed. Supp. 747, 750, 751, that :

" ' " . . . as long as probable cause for an arrest exists, arrest warrants are unnecessary, even where there is time to obtain them. *See Beck v. Ohio*, 379 U.S. 89, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). . . ." ' "

The trial court also said that "the deputies did not tell the defendant's mother the real purpose for their visit, that being to arrest her son." This appeared to the trial court to have been a deception. The trial court also said that the consent was not valid because it could not be considered "a free, intelligent, unequivocal and specific waiver." These statements demonstrate that the trial court applied a waiver standard to determine whether the consent was voluntary. The court of appeals also

found the consent was obtained by deception and applied a waiver standard.

The standard for determining the voluntariness of consent under the fourth amendment was set forth in *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973), where the Supreme Court used the test for voluntary confessions to determine the voluntariness of consent in fourth amendment cases. In *Schneckloth*, a car in which the defendant was a passenger was stopped by the police because a headlight and the license plate light were burned out. A police officer asked if the car could be searched and one of the passengers consented. The police officer did not advise the defendant of the reason for the search or that any evidence or contraband, if found, would be seized. While searching the car trunk, which a passenger had unlocked, three stolen checks were found wadded up under the left rear seat. In that case the Court stated:

" 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' *Culombe v. Connecticut, supra,* at 602." [*Culombe,* 367 U.S. 568 (1961)]

In *Schneckloth*, the Court criticized the approach taken by the Court of Appeals for the Ninth Circuit as follows:

"The approach of the Court of Appeals for the Ninth Circuit finds no support in any of our decisions that have attempted to define the meaning of 'voluntariness.' Its ruling, that the State must affirmatively prove that the subject of the search knew that he had a right to refuse consent, would, in practice, create serious doubt whether consent searches could continue to be conducted.

There might be rare cases where it could be proved from the record that a person in fact affirmatively knew of his right to refuse— . . . But more commonly where there was no evidence of any coercion, explicit or implicit, the prosecution would nevertheless be unable to demonstrate that the subject of the search in fact had known of his right to refuse consent.

" . . . .

"One alternative that would go far toward proving that the subject of a search did know he had a right to refuse consent would be to advise him of that right before eliciting his consent. That, however, is a suggestion that has been almost universally repudiated by both federal and state courts, and, we think, rightly so. For it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning. Consent searches are part of the standard investigatory techniques of law enforcement agencies." *Id.* at 229–32. (Footnotes omitted.)

There is a difference between consent for searches and seizures and waiver of trial rights. In *Schneckloth,* the Court distinguished between them as follows:

"There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." *Id.* at 241.

A person must be informed in order to waive a right; however, a consent must be voluntary only, in other words, free of coercion, which is determined from the totality of the circumstances. In *Schneckloth* at 242–43, the Court stated:

"While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search. . . . We have

only recently stated: '[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.' *Coolidge v. New Hampshire,* 403 U.S., at 488."

At 246 of *Schneckloth,* the Court held:

"[T]here is nothing in the purposes or application of the waiver requirements of *Johnson v. Zerbst* that justifies, much less compels, the easy equation of a knowing waiver with a consent search. . . .

"Much of what has already been said disposes of the argument that the Court's decision in the *Miranda* case requires the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent. The considerations that informed the Court's holding in *Miranda* are simply inapplicable in the present case."

Finally, in *Schneckloth,* at 248–49, the Court stated:

"Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

Deputy Mielke's uncontradicted testimony shows that when the deputies arrived at the defendant's home, they identified themselves to the defendant's mother, advised her they wanted to talk to her son and asked whether he was home. There is no evidence that the deputies used force or threatened the use of force or that they relied on an untruthful claim of lawful authority to enter the home in order to obtain consent. There is no evidence

of police coercion that would render the consent involuntary. The mother led the deputies into the home and she exercised her free choice to permit their entry into her home. The deputies gave the mother all the information she needed to consent to their entry by telling her they wanted to talk to her son. The dissent stresses the alleged deception perpetrated on the mother. However, the state does not concede there was deception and, in fact, the officers upon entry did start to talk to the defendant and when he got up and started to say something, they told him he was under arrest.

In *In re Anthony F.*, 293 Md. 146, 442 A.2d 975 (1982), on facts almost identical to those in the instant case, the Maryland Court of Appeals found the arrest was valid. The court found no merit in the argument that the voluntary character of the permission to enter was destroyed because the police only told the sister that they wanted to talk to her brother. That court stated:

"Regarding the question of a policeman's modus operandi in obtaining consent, the Supreme Court in *Schneckloth* observed that, 'two competing concerns must be accommodated in determining the meaning of a "voluntary" consent—the legitimate need for such [police entry] and the equally important requirement of assuring the absence of coercion.' *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S. Ct. at 2048. We do not think that the officers' statement of their purpose in this case in any way undermined the voluntary character of the young lady's consent. They did not mask their official capacities, nor did they misrepresent their purpose for being there. Without being explicit, they stated that they wanted to talk with the brother, and the sister sought no further elaboration. Certainly, a policeman has a right to execute his lawful function without gratuitously advertising his every move to anyone he might encounter in that pursuit." 442 A.2d at 980.

The reasoning of *Anthony* is sound and realistic. To say it is deception for the officers to state that they

wanted to speak to the brother, without advising that they were also there to arrest him, is to apply an unwarranted assumption by using a scrupulous analysis not borne out by the total circumstances, which were that the officers identified themselves, asked whether the defendant was home, even though they could see him from the outside, and asked permission to enter. There was no coercion or misstatement of their authority.

Other authorities have held the consent as voluntary under circumstances similar to those of the instant case. They are: *People v. Bean,* 84 Ill. 2d 64, 417 N.E.2d 608, 611 (1981); *People v. Kraman,* 96 Ill. App. 3d 390, 421 N.E.2d 346 (1981); *People v. Lane,* 106 Ill. App. 3d 793, 436 N.E.2d 704 (1982); *People v. Garcia,* 94 Ill. App. 3d 940, 419 N.E.2d 542 (1981). In none of these cases did the police officers mention a possible arrest when they asked whether they could enter the home. The officers asked to talk to someone, or to see someone, or asked whether a particular person lived at the residence; the police officers never said that the reason they wanted to enter the home was to arrest someone. In all of these cases, the appellate courts found that consent was voluntarily given and that the police entry into the homes and the warrantless arrests were constitutional. *Ricketts v. State,* 46 Md. App. 410, 417 A.2d 465, 469 (1980), *aff'd* 290 Md. 287, 429 A.2d 1025 (1981), held that the fourth amendment does not require the police to inform the suspect of the purpose of a search. This is supported in *Schneckloth* where the officer only asked the suspect if he could search the car. There is no indication in the *Schneckloth* opinion that the officer told the suspect of the reason for the search or that he intended to seize contraband or evidence if he found any. Still, the United States Supreme Court found that the consent to search had not been coerced.

The trial court relied on *Johnson v. Zerbst*, 304 U.S. 458 (1938) as the standard for waiver, that being whether the state demonstrated "an intentional relinquishment or abandonment of a known right or privilege." This same test was applied by the court of appeals. The *Johnson* test for the waiver of a constitutional right is not applicable to a consent search or consensual home entry under the fourth amendment. *Schneckloth*, 412 U.S. at 241, 242, 243–44 n. 31, 246. The proper test for voluntariness of consent under the fourth amendment is whether under the totality of the circumstances it was coerced.

In *Gautreaux v. State*, 52 Wis. 2d 489, 492–93, 190 N.W.2d 542 (1971), which was decided one and one-half years before the *Schneckloth* decision, this court stated:

"Although the state has the burden of proving by clear and positive evidence the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied, . . . there is no presumption a consent to a search given by a person under arrest is involuntary and coerced as a matter of law."

The defendant in *Gautreaux* was under arrest and the owner of the car, after twice refusing to allow a search, consented to allow the search. The words used in *Gautreaux* do not differ in meaning from a voluntary consent as defined in *Schneckloth*. There is nothing in sec. 968.07, Stats., nor Art. I, secs. 8 and 11 that requires the definition of consent for entry into the home to be any different than the definition for consent under the fourth amendment of the United States Constitution as stated in *Schneckloth*.

In this case, since the state relied upon consent for the entry, it had the burden of proving that the consent was freely and voluntarily given. *Schneckloth*, 412 U.S. at 222. In *State v. Mazur*, 90 Wis. 2d 293, 302, 280 N.W.2d

194 (1979), this court stated: "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search he has the burden of proving that consent was freely and voluntarily given." The state has met its burden. The defendant's mother's knowledge of a right to refuse entrance into the home is not a prerequisite to establishing a voluntary consent; it is only one factor to be considered under the totality of the circumstances. *Schneckloth,* 412 U.S. at 234, 249.

The dissent cites Wisconsin case law interpreting and applying the Wisconsin Constitution, Art. I, sec. 11; however, these cases predate by many years *Wolf v. Colorado,* 338 U.S. 25 (1949), which held that the fourth amendment of the United States Constitution applied to each of the states through the fourteenth amendment. The language of Wisconsin Constitution Art. I, sec. 11 is identical to and was copied from the United States Constitution's fourth amendment. Since *Wolf,* the Wisconsin cases cited by the dissent would have to be evaluated to determine whether their valid reasonings gave different interpretations than those now being given by the United States Supreme Court regarding the fourth amendment and whether the search and seizure law of Wisconsin differs in any respects by giving greater civil rights to its state citizens than those already extended by the fourth amendment of the United States Constitution. In this case, we state that the rulings of the United States Supreme Court are not at odds with Art. I, sec. 11 of the Wisconsin Constitution. If there is any reason for the dissent's disappointment with the use of the English language, it is with the United States Supreme Court's distinction between consent being arrived at voluntarily and the waiver of a constitutional right being done knowingly and intelligently.

Applying the proper standard of consent to this case, *i.e.,* whether under the total circumstances it was vol-

untarily given, we hold that the defendant's mother's consent was voluntary.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The circuit court found that the police officers "told the defendant's mother that they . . . wanted to talk to her son. She invited them into the home. . . . It is clear from the record that the deputies went to the defendant's home not to speak with him but to arrest him. . . . [T]he testimony shows that the deputies did not tell the defendant's mother the real purpose for their visit, that being to arrest her son. . . . The deputies appeared by their actions to have made a deliberate decision to arrest the defendant before they arrived at his home." (Memorandum decision, pp. 1, 3.)

The circuit court's findings of fact are not challenged by the state. Indeed the facts are not disputed by the parties.

If this were a contract or tort case, the officers' conduct would be governed by the general rule that a person's intent is a question of fact, generally one to be determined by the trier of fact, and that a misstatement of intent can be a misrepresentation which will render a contract voidable or which will render the speaker liable for a tort. *See State v. Lossman,* 118 Wis. 2d 526, 348 N.W.2d 159 (1984) ; *In re Estate of Lecic,* 104 Wis. 2d 592, 604 n. 8, 312 N.W.2d 773 (1981) ; 3 Restatement (Second) of Torts sec. 544 (1977).

The fundamental principle governing this case is that a warrantless search or seizure inside a home is "presumptively unreasonable." *Welsh v. Wisconsin,* —— U.S. ——, —— (1984) (slip opinion p. 8) ; *Payton v. New York,* 445 U.S. 573, 586 (1980). Justice Jackson eloquently explained why a warrant issued by a judicial officer is required for a search of a home:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson v. United States*, 333 U.S. 10, 13–14 (1948).

The federal and state constitutions bar a law enforcement officer's warrantless entry into a home unless there are exigent circumstances or there is a valid consent to enter.[1] In this case there was neither a warrant nor an exigent circumstance. Therefore the entry into the home and the subsequent arrest are valid only if the officers had obtained a valid consent.

---

[1] *Payton v. New York*, 445 U.S. 573 (1980); *Laasch v. State*, 84 Wis. 2d 587, 267 N.W.2d 278 (1978).

The fourth amendment to the federal Constitution, applicable to the states through the fourteenth amendment, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Art. I, sec. 11, Wis. Const., provides:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

I conclude that the police officers' misstatement of their intent constitutes a misrepresentation or deception which vitiates consent in this case.

The state argues that the police did not have to state the purpose of their seeking entry into the home and that the police officers' statement that they wanted to speak to the defendant—when they really intended to arrest him—was not a deception vitiating consent. The court of appeals accepted part of the state's position and rejected part, saying: "We do not hold that police must state the purpose of their visit to a home in order to obtain a valid consent to enter, only that they may not gain entry through deception." 115 Wis. 2d at 118, n. 3.

This is not a case in which the police officers entered the home intending to talk to the defendant and then decided to arrest him. When the police officers entered the home in this case, they did not wish to and did not in fact "talk" to the defendant in the home. The majority opinion correctly sets forth Officer Mielke's testimony at slip op., p. 105, *supra*: "The detectives told the defendant they wanted to talk to him and when the defendant got up and started to say something, Mielke told him he was under arrest." Compare the majority's restatement of the testimony when it intimates that the detectives did in fact talk to the defendant: "[I]n fact the officers upon entry did start to talk to the defendant and when he got up and started to say something, they told him he was under arrest." Slip op., p. 112, *supra*.

The police officers were obviously concerned that they would not gain consent to entry if they stated their true intent, the true purpose of their mission. I agree with the court of appeals which observed, "If we were to approve this type of [police] conduct . . . we would permit an important state and federal constitutional right [of the people to be secure in their houses from unreasonable searches and seizures] to be vitiated by the guile of those

on whom we depend to protect our rights." *State v. Rodgers,* 115 Wis. 2d 118, 120, 339 N.W.2d 605 (Ct. App. 1983).[2]

The majority apparently holds that despite the officers' misstatement of their intent the mother exercised her free choice to permit entry into her home and that the consent to enter the home was validly obtained. To reach this conclusion the majority relies on *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26 (1973), in which the United States Supreme Court decided that the standard under the fourth and fourteenth amendments to determine the validity of consent to search a car is "voluntariness".

The majority's reliance on *Schneckloth* is misplaced. The majority mistakenly reads *Schneckloth* broadly and expansively to cover this case, even though the *Schneckloth* court explained that its decision was "a narrow one," see quoted passage at slip op., p. 111, *supra.* The *Schneckloth* decision does not address directly the issue presented in this case. In *Schneckloth* the United States Supreme Court held only that state law enforcement officers were not required to inform the person whose consent was sought of his or her federal constitutional right to refuse to consent to a warrantless search or seizure.[3] This case

[2] Neither party questioned the authority of the defendant's mother to grant consent to enter the home.

[3] *Schneckloth* has been criticized by various commentators. 2 LaFave, *Search and Seizure,* sec. 8.2, p. 636–7 (1978); Dix, *Waiver in Criminal Procedure: A Brief for More Careful Analysis,* 55 Tex. L. Rev. 193, 224–29 (1977); Chase, *The Burger Court, the Individual, and the Criminal Process: Directions and Misdirections,* 52 N.Y.U.L. Rev. 518 (1977); Note, *Valid Consent to Search Determined by Standard of "Voluntariness—Schneckloth v. Bustamonte,"* 12 Am. Cr. L. Rev. 231 (1974).

The New Jersey Supreme Court has not followed *Schneckloth* in interpreting the New Jersey Constitution. See *State v. Johnson,* 68 N.J. 349, 346 A.2d 66 (1975).

does not involve lack of knowledge of the right to refuse consent.

*Schneckloth* involved the officer's failure to advise the suspect of a constitutional right to refuse consent to a warrantless search of a car when the officer sought consent to search a car. In contrast, this case involves an officer's intentional misstatement of their purpose in seeking consent to a warrantless entry of a home. There is a bright line between an officer's failure to inform a suspect of a legal right to refuse consent to a warrantless search and an officer's intentional misrepresentation of a fact to obtain consent to a warrantless arrest.

*Schneckloth* involved search of a car officers stopped on the highway for a traffic violation. This case involves officers intentionally going to the suspect's home to make an arrest. There is a bright line in fourth amendment law between entry into a car where the right of privacy is least protected and entry into a home where privacy is most protected. *State v. Welsh,* 108 Wis. 2d 319, 341, 321 N.W.2d 245 (1982) (Abrahamson, J., dissenting). Furthermore, in *Schneckloth* the Court stressed

Professor Taylor, the reporter for the search and seizure sections of the *Model Code of Pre-Arraignment Procedure,* commented on *Schneckloth* as follows: "It seems unlikely that there is any greater knowledge of one's right to refuse a search than the right to silence." He goes on to explain that a choice based on a wholly erroneous factual belief may not be the result of a will that has been overborne, but neither is it an understanding choice.

"In consent searches, the police have full knowledge that the person from whom they are seeking consent is under no obligation to give it. The right to refuse is a fact crucially pertinent to an understanding consent and, if there is the slightest doubt that the person in question is not aware of his right, and no such information is given him, the police are eliciting consent on the basis of withheld information. It is hard to describe such conduct as other than deceptive, or the Court's decision [in *Schneckloth*] as other than retrograde." Commentary, sec. 240.2, pp. 536–537 (Proposed Official Draft, April 15, 1975).

the practical difficulties of requiring the officers to advise and warn the suspect after the officers stopped the car on the highway. There are no such practical difficulties in this case. The crime was reported and the suspect identified the day before the officers made the arrest. The officers could have obtained a search warrant. Or the officers could have obtained consent to enter the home without misstating their purpose.

The majority apparently reads *Schneckloth* as saying that only deceptive conduct amounting to coercion renders the consent involuntary and that the deception in this case cannot be characterized as coercive or as rendering the mother's consent involuntary. The majority's view that voluntariness turns only on whether a defendant's will was overborne is indefensibly narrow. In the context of the *Schneckloth* fact situation, the Court stressed volition and perceived a reduced need for "awareness." But *Schneckloth* is limited to its fact situation: a consent to search a car on the road. The circumstances in this case are very different.

It is well recognized that the voluntariness test set forth in *Schneckloth* is an elusive standard. The *Schneckloth* court itself recognized there is "no talismanic definition of 'voluntariness' mechanically applicable to the host of situations where the question has arisen. 'The notion of "voluntariness" . . . is itself an amphibian.' " *Schneckloth v. Bustamonte,* 412 U.S. at 224. Indeed the United States Supreme Court has been criticized for not providing a firm principle to guide judicial decisions as to what factors deprive consent of voluntariness. 2 La Fave, *Search and Seizure* sec. 8.2, p. 637 (1978).

Although *Schneckloth* intermingles the issue of the suspect's awareness of her or his situation with the issue of the pressures acceptable upon the person who makes a choice, it is generally accepted that the concepts of voluntariness and consent have cognitive as well as voli-

tional components. See 2 LaFave, *Search and Seizure* sec. 8.2, pp. 636–638 (1978) ; Grano, *Voluntariness, Free Will and the Law of Confessions*, 65 Va. L. Rev. 859, 860 (1979). In contract law, if a party's manifestation of assent is induced by a fraudulent or material misrepresentation upon which the party is justified in relying, the consent may be withdrawn. *Restatement (Second) of Contracts* sec. 164(a) (1979). I see no reason why a lower standard than that applied in a contract case should be applied when the issue is consent to enter a home without a warrant to make an arrest when a search warrant could be obtained and there are no exigent circumstances.

While it is clear from the *Schneckloth* decision that consent to a warrantless search must not be the product of coercion and that consent need not be predicated on specific knowledge of the right to refuse consent, the United States Supreme Court has not provided a firm principle "for deciding in varying circumstances whether ignorance of a highly relevant fact deprives consent of voluntariness." Weinreb, *Generalities of the Fourth Amendment,* 42 Univ. Chi. L. Rev. 47, 57 (1974).

Even though the United States Supreme Court has not set forth a guiding principle, the United States Supreme Court has recognized in *Schneckloth* that the phrases "voluntariness," "freedom from fear or coercion," and "free and unconstrained choice" are shorthand expressions indicative of the complex values which the law considers and seeks to maximize. *Schneckloth,* 412 U.S. at 224. According to the Court, the criteria for voluntariness reflect an accommodation of competing values. A determination of the validity of the consent depends on a balancing process. Another way of stating this concept is that consent searches are a legitimate exception to the warrant requirement because consensual searches are inherently reasonable. The ultimate cri-

terion for determining the validity of consent is therefore whether the bounds of reasonableness have been crossed.

One value in this balancing process is the constitutional right to privacy in the home. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313 (1972) ; quoted with approval in *Welsh v. Wisconsin,* —— U.S. ——, —— (1984) (slip op. at p. 107, *supra*). See also *Laasch v. State,* 84 Wis. 2d 587, 597, 267 N.W.2d 278 (1978) (Abrahamson, J. concurring as to Wisconsin Constitution).

Another value is that public officials not deviate from high standards of conduct. Deception and misrepresentations are such deviations. Any deviation fosters cynicism in the public and callousness in the officials which is then difficult to contain within the bounds of the special needs which justify the deviation.

A third value is the need for effective law enforcement. Undue restriction of the effective enforcement of criminal law diminishes our security. Thus it is recognized that under certain circumstances officials may, in combatting crime and in dealing with persons who are suspected of having violated the criminal statutes, depart from usual high standards of conduct to which we hold government officials. In the investigation of some kinds of criminal cases, "stealth and strategy are necessary weapons in a police officer's arsenal." *Sherman v. United States,* 356 U.S. 369, 372 (1958).

A fourth value may be that "the community has a real interest in encouraging consent" in order to facilitate legitimate law enforcement activities. *Schneckloth v. Bustamonte,* 412 U.S. at 243. Effective law enforcement depends on the cooperation and assistance of the citizenry.

A final value is "society's deeply felt belief that criminal law cannot be used as an instrument of unfairness."

*Schneckloth v. Bustamonte,* 412 U.S. at 223–27. In the final analysis, then, in each "consent" case there is an assessment of "fairness." *Schneckloth,* 412 U.S. at 223–27; 2 LaFave, *Search and Seizure* sec. 8.2(n), p. 689 (1978).

In this case, entry into the home to make a warrantless arrest was not required to stop a threatened or ongoing crime or to capture a fleeing or difficult to find suspect. Crime control and law enforcement do not require, in this case, that law enforcement officers use deceptive practices. In this case there was no necessity for law enforcement purposes for the officers to gain immediate entry into the home. The crime—false imprisonment of the defendant's girl friend—had allegedly occurred two days before the arrest and the victim had reported the crime to the police the day before the arrest. The police had time to plan the arrest. The circuit court concluded that there was "nothing in the record which provides any reason for not obtaining a warrant." (Memorandum decision, p. 3.)

The majority's condoning police deception in this case may actually hinder police efforts in the future by discouraging citizen cooperation with law enforcement officers. Since the majority opinion provides no assurance that the police will not misstate the purpose for which they seek entry into the home, the majority's decision may lead citizens to be distrustful of police officers and to be reluctant to consent to police entry into a home. As a result of the majority opinion, citizens are likely to conclude that they should exercise their constitutional right to refuse consent to a police officer's request to enter a home when the officer does not have a warrant. If citizens cannot trust law enforcement officers, the officers cannot expect to be treated by the citizens as trustworthy.

In this case, society's interest in the sanctity of the home and in high standards of conduct for government

officials substantially outweighs the limited inconvenience of requiring law enforcement officers not to misstate their intent in seeking consent to enter the home or of requiring law enforcement officers to get warrants before seeking entry into the home. I therefore conclude that in assessing fairness, in assessing reasonableness, this court should hold that the police deception in this case vitiated the consent.

I refer to *Schneckloth* and the fourteenth amendment in this case because the majority relies on *Schneckloth* and decides the search and seizure issue under the fourteenth amendment. I conclude that the entry into the home and the arrest violate the fourteenth amendment.

Furthermore, I have considered the validity of the entry and the arrest under Article I, section 11, of the Wisconsin Constitution, apart from the fourteenth amendment, and I conclude, on bona fide separate, adequate, and independent state law grounds, *Michigan v. Long,* —— U.S. ——, ——, 51 U.S.L.W. 5231, 5234 (1983), that this search and arrest violate the Wisconsin Constitution. Any federal cases referred to in this opinion are not cited as binding precedent in interpreting Article I, section 11, of the Wisconsin Constitution, but for guidance.

Although the majority concludes that Article I, section 11, is substantially the same as the fourth amendment, it errs in analyzing the consent issue under the state constitution by guessing what the United State Supreme Court might hold under the fourth amendment. Decisions of the United States Supreme Court and other courts interpreting constitutional language substantially similar to that of the Wisconsin Constitution may be helpful and persuasive in interpreting the Wisconsin Constitution, but these decisions of other jurisdictions are not binding on this court in our interpretation of our constitution.

Even if Article I, section 11, had been copied from the federal Constitution, rather than from another constitution or document, see note 5 *infra,* our court is not bound by the construction placed on the fourth amendment by the United States Supreme Court subsequent to the adoption of our constitution in 1848, unless we find the construction sound and the reasoning persuasive. *Ditsch v. Finn,* 214 Wis. 305, 308, 309, 252 N.W. 562 (1934); *B.F. Sturtevant Co. v. Industrial Comm.,* 186 Wis. 10, 17, 202 N.W. 324 (1925); 2A Sands, *Sutherland Statutory Construction* sec. 52.02 (1973).

Although our court has been willing to consider federal precedents which accord with the Wisconsin Constitution, *Allen v. State,* 183 Wis. 323, 329, 197 N.W. 808 (1924), this court has refused to be bound by federal decisions which are contrary to our state constitutional values. This court clearly stated this view in *Nunnemacher v. State,* 129 Wis. 190, 198, 108 N.W. 627 (1906), as follows: "We are fully aware that the contrary proposition has been stated by the great majority of the courts of this country, including the supreme court of the United States. The unanimity with which it is stated is perhaps only equaled by the paucity of reasoning by which it is supported."

Justice Smith's statement in 1855 urging the court to look to the Wisconsin constitution should be followed by the court:

"The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs—let us construe, and stand by ours." *Attorney General ex rel. Bashford v. Barstow,* 4 Wis. 567, [*758] (1856).

This court has a long history of recognizing the vitality of the Declaration of Rights of the Wisconsin Constitu-

tion (Article I) and of interpreting Article I, section 11. We should continue our traditional approach of examining our own constitution and our own precedents. See Sundquist, *Construction of the Wisconsin Constitution—Recurrence to Fundamental Principles,* 62 Marq. L. Rev. 531 (1979); Comment, *The Independent Application of State Constitutional Provisions to Questions of Criminal Procedure,* 62 Marq. L. Rev. 596 (1979); Comment, *Rediscovering the Wisconsin Constitution: Presentation of Constitutional Questions in State Courts,* 1983 Wis. L. Rev. 483.

Our court has long recognized that the home is entitled to special dignity and sanctity under our state constitution. See, *e.g., Hoyer v. State,* 180 Wis. 407, 417, 193 N.W. 89 (1923);[4] *Jokosh v. State,* 181 Wis. 160, 163, 193 N.W. 976 (1923).[5] Long before it was constrained to

[4] Writing for the court, Justice Eschweiler described the importance of Article I, section 11, of the Wisconsin Constitution to the people of the state as follows:

"Sec. 11, art. I, Wis. Const., *supra,* is a pledge of the faith of the state government that the people of the state, all alike (with no express or possible mental reservation that it is for the good and innocent only), shall be *secure* in their persons, houses, papers, and effects against unreasonable search and seizure. This security has vanished and the pledge is violated by the state that guarantees it when officers of the state, acting under color of state-given authority, search and seize unlawfully. The pledge of this provision and that of sec. 8 are each violated when use is made of such evidence in one of its own courts by other of its officers. That a proper result—that is, a conviction of one really guilty of an offense—may be thus reached is neither an excuse for nor a condonation of the use by the state of that which is so the result of its own violation of its own fundamental charter." *Hoyer v. State,* 180 Wis. 407, 417, 193 N.W. 89 (1923).

[5] Chief Justice Vinje viewed the state constitutional guarantee against unreasonable search and seizure as a fundamental part of the organic law of this state:

". . . It is also said that, if searches such as this cannot be made, the prohibition law cannot be enforced. This may be true

do so by the fourth and fourteenth amendments to the United States Constitution, this court relied on the Wisconsin Constitution to sustain and enforce the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. *Laasch v. State,* 84 Wis. 2d 587, 598, 267 N.W.2d 278 (1978) (Abrahamson, J., concurring).

In light of the frequent use of consent to justify noncompliance with the warrant requirement, diluting the meaning of consent dilutes the impact of the state constitutional guarantee of the sanctity of the home. This court should avoid facilitating the erosion of the state constitutional guarantee of privacy. The solution to the problem presented by this case is not to reduce the requirements for consent but to prevent the problem from arising by encouraging officers to obtain warrants.

Characterizing the conduct of the defendant's mother in this case as evincing free and voluntary consent to enter the home compromises the integrity of the state constitutional guarantee of the sanctity of the home and makes a mockery of the English language.

Since I conclude that the warrantless arrest in the home was illegal, I would hold that the circuit court did not acquire personal jurisdiction of the defendant. *State v. Monje,* 109 Wis. 2d 138, 147, 325 N.W.2d 695 (1982). I would therefore affirm the order of the circuit court

in part or it may be true in whole. The answer is that an article of the constitution having its origin in the spirit if not in the letter of the Magna Carta prevents it, and that it is the duty of the court to sustain and enforce the constitution in its entirety, and not to permit what may seem to be presently a desirable mode of procedure to annul such fundamental portions of our organic law as the freedom from unlawful searches. The importance of such a provision may be lost sight of in times of peace in a well-organized and well-administered state, but in times of stress or dissensions its value is as great as those who inserted it in the constitution conceived it to be." *Jokosh v. State,* 181 Wis. 160, 163, 193 N.W. 976 (1923).

and the decision of the court of appeals dismissing the action. I dissent.

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins in this dissent.